208 So.2d 592

**BLUE CROSS–BLUE SHIELD of Alabama**

v.

Jeanette NELSON.

**8 Div. 139.**

Supreme Court of Alabama.

March 14, 1968.

Robt. McD. Smith, Lange, Simpson, Robinson & Somerville, Birmingham, and Almon & McAlister, Sheffield, for appellant.

Murray W. Beasley, Tuscumbia, for appellee.

COLEMAN, Justice.

Defendant appeals from judgment for plaintiff in action on a contract whereby defendant promised to furnish hospital services to plaintiff. The contract appears to be of the type that is commonly called a Blue Cross hospital insurance policy.

Plaintiff alleged that she paid the premium and had been hospitalized but defendant had failed and refused to pay the benefits due under the policy.

Defendant pleaded the general issue and also a special plea that the contract contained a provision [1] whereby hospital benefits would not be available to plaintiff for any condition, disease, or ailment, known or unknown, which existed on the effective date of the policy until plaintiff had been covered by the contract for nine consecutive months immediately preceding the date of her admission to the hospital; that the condition, etc., for which plaintiff was admitted to the hospital on February 12, 1961, was a condition, etc., which existed on the effective date of the contract and that plaintiff had not been covered by the contract for nine consecutive months immediately preceding her hospital admission; wherefore, defendant was not liable and plaintiff was not entitled to recover.

It was agreed that the effective date of the policy was January 20, 1961, and that if plaintiff was entitled to recover, the amount of recovery would be $1,394.60. Two witnesses testified for plaintiff. No witness testified for defendant. The jury returned a verdict for plaintiff.

*Assignments 6 and 7.*

Defendant contends that the court erred in refusing its requested affirmative charges, with and without hypothesis. Defendant says it was due the affirmative charge because "all of the evidence was offered by the plaintiff," "the condition or ailment for which she was hospitalized was cholecystitis and cholelithiasis, i. e., gall bladder disease and gall stones," and there was "no conflict as to the existence vel non of the gall stone and the gall bladder condition on the date the policy was issued."

1. Section VIII of the contract contains the following provision:

"3. PRE-EXISTING CONDITIONS— Hospital service hereunder shall not be available to any member for any condition, disease or ailment, congenital or otherwise (known or unknown), which existed on the effective date of his coverage hereunder, or for which medical or surgical treatment or advice has been rendered within one (1) year prior to the effective date of his said coverage, until the member shall have been covered by a Blue Cross hospital service contract for a period of nine (9) consecutive months immediately preceding the date of his hospital admission."

It appears to be agreed that defendant had the burden to prove its special plea, No. 2. The court charged the jury in part:

"I charge you that the burden of proof is on the plaintiff to reasonably satisfy you of the truth of what she alleges in the complaint, and when that is met, the burden is then on the defendant to reasonably satisfy you under plea 2 of the truth of plea 2 of the defendant."

Defendant did not except to this part of the oral charge.

This court has said:

"When the party holding the burden of proof wholly fails to adduce evidence to support the cause of action or defense, or where the testimony of one's own witnesses, without conflict, makes out the case of the opposing side, the court may direct the verdict by affirmative instruction without hypothesis on request in writing. In such case there is nothing to argue. The party may not assail the credibility of his own witnesses in argument." Harris v. State, 215 Ala. 56, 58, 109 So. 291, 293.

It appears to be conceded that plaintiff did make out a prima facie case to support her complaint. The question then is whether the testimony of plaintiff's witnesses, without conflict, made out the defense set up in plea 2, that is, that the condition, disease, or ailment for which plaintiff was hospitalized existed on the effective date of policy, January 20, 1961, which was twenty-three days prior to her admission to the hospital on February 12, 1961.

If the evidence, without dispute, is that the condition for which plaintiff was hospitalized existed on January 20, 1961, then, under the rule relied on by defendant, it would be due the affirmative charge, whether with or without hypothesis we do not decide.

The first witness was plaintiff herself. She testified that she was employed in Sheffield, Alabama, on January 20, 1961, and at that time she was issued the policy sued on; that she had worked for the same company four or five months; that for approximately one year prior to January 20, 1961, she had been continuously and steadily employed; that she was admitted to the hospital on February 12, 1961; that she was "sick at her stomach, like I had indigestion," could not eat, and the pain was getting worse so she called the doctor; this took place on Sunday, February 12, 1961; she had worked the preceding week but not on Saturday; her employer did not work on Saturday; on the day before she went to hospital, she went bowling and ate a hot dog.

The only other witness was Dr. Davis. His testimony is as follows. He first treated plaintiff in 1958 for contusions suffered when she fell down stairs where she worked. He treated her also in November, 1959, and February, 1960, for a cold, and again in June, 1960, for nervous indigestion and gastritis. Gastritis is not necessarily connected with the gall bladder disease and is not necessarily a symptom of gall bladder.

He next saw plaintiff when he admitted her to hospital for observation in February of 1961. His diagnosis was acute and chronic cholecystitis which is acute and chronic gall bladder and secondary anemia. Acute means an acute condition where there is a sudden onset, the patient may have severe high fever, it is sort of hard to explain, it comes on quickly, suddenly.

He ran some lab tests because he did not check her before for acute hepatitis. Her diagnosis lay between two conditions, either acute or chronic cholecystitis or acute hepatitis, in either case the disease gives similar symptoms.

Hepatitis is acute inflammation of the liver. Tests were run again. He made up his mind to put emphasis on any gall bladder trouble which she had.

On February 23, 1961, eleven days after plaintiff was admitted, he operated on her.

The gall bladder was infected, it was a little smaller than ordinary; gall bladders vary in size.

Plaintiff's gall bladder contained one solitary stone. Around this stone was some other substance, some pus in the cavity of the gall bladder. Throughout the gall bladder there was some dark necrosis or gangrene. He removed the whole gall bladder.

It was an acute emergency. He believes the patient should have been operated on as soon as she came in, or the day after, because of her age and because of the acute inflamed gall bladder but "we didn't get to go ahead without ruling out the hepatitis."

His opinion is that plaintiff's gall bladder became gangrenous with a formation of pus during the eleven days before she was operated on. He does not think anyone knows how long any other stone could make up or crystallize. His opinion is that this stone was present prior to the eleven days' period. He could not tell how long it took the stone to form, nobody knows.[2]

On cross-examination the doctor testified that the gall bladder became gangrenous during the eleven days she was in the hospital; that, in his opinion, her prior cholecystitis was causing the pain she had the day she was admitted; his diagnosis was acute and chronic cholecystitis; chronic cholecystitis is a condition of gall bladder that has existed for some time; the gallstone was large enough to fill the entire cavity of the gall bladder.

As to the time the stone had existed, he said, "nobody knows," in his opinion, probably the stone existed twenty-three days prior to plaintiff's admission on February 12.[3]

2. Dr. Davis testified:

"Q. Do you have an opinion as to when Jeanette Nelson's gall bladder became gangrenous, and such inflammation in there?

"A. My opinion, of course, no one knows, my opinion is that the gall bladder became gangrenous with a formation of pus during the eleven days she was—during the eleven days before she was operated on, at which time I don't know.

"Q. The stone that was in there, is it your medical opinion that stone could have been in there prior to the eleven day period?

"A. I don't think anyone knows how long any other stone could make up or *crystallize*, my opinion is that this stone probably was present prior to the time, to the eleven days she was there.

"Q. Do you have a medical opinion, can you tell this jury, how long it had been in there, doctor, I understand that is a hard question?

"A. I couldn't tell how long it took the stone to form, nobody knows.

"Q. Let me ask you this, isn't it true a person can have a gall stone in a gall bladder for over a period of months and it be dormant and may be the cause of some ailment or disease later, at some later date, but not give any trouble for a long period of time?

"MR. SMITH: WE OBJECT, IT IS LEADING AND SUGGESTIVE.

"OBJECTION OVERRULED.

"DEFENDANT EXCEPTS.

"BY THE COURT: JUST ANSWER 'YES' OR 'NO'.

"BY THE WITNESS:

"Q. Can I qualify that a little?

"BY THE COURT: YES SIR, GO AHEAD.

"A. It is possible that could be true, but because the patient not to have symptoms to complain about it or go to a doctor about it, but it is hard to say whether it would cause any trouble or not.

"Q. I believe you testified awhile ago actually nobody knows, do they?

"A. No.

"Q. About stones in the gall bladder?

"A. No, sometimes........"

3. Dr. Davis testified:

"Q. Based on what you saw and what the examination revealed and based on the pathologist report you have there?

"A. Yes sir.

"Q. Can you tell whether in your opinion this gall stone existed more than twenty-three days prior to the time Miss Nelson was admitted to the hospital on February 12, what is your opinion?

"A. Yes sir, of course, nobody knows, my opinion is it existed longer than twenty-three days, probably the gall stone existed, yes, that was twenty-three days it was significant.

On re-direct examination, he testified as follows:

"Q. Now, doctor, I believe you told Mr. Smith on cross-examination, in your opinion, her gall bladder was not normal twenty-three days before she was admitted, you think the mere fact that she had a stone, would that cause you to testify it was not normal?

"A. I did not testify that it wasn't normal, because I didn't know, but in my honest opinion, and it is conceded, and my opinion, to believe that stones like that one probably existed prior to several weeks, it is hard to say, that is just my opinion, I don't know.

"Q. Was the fact that the stone was in there, is that why you testified it was not a normal gall bladder?

"A. It is just inconceivable for me to believe a stone that big could have been formed that hard within a week or two, it is possible, but that's just my personal opinion, it might have formed in two days, God Almighty, only, knows that.

"Q. That's why you say it was not a normal gall bladder?

"A. That's why I say that's my opinion."

It seems to us there is a conflict in the doctor's testimony. In the portion last quoted, he says it is his "personal opinion" that the stone could not have formed within two weeks, but, "it is possible" and "it might have formed in two days," and "God Almighty, only, knows that."

"Q. Would you say, in your opinion, probably it existed as long as three months?
"A. I don't say that.
"Q. Do you say you have an opinion it was present longer than twenty-three days?
"A. That's my medical opinion.
"Q. That's your medical opinion?
"A. Yes sir.

While the doctor's testimony is probably sufficient to support a finding that the stone and an infected gall bladder existed on the effective policy date, we are not persuaded that the testimony is without conflict or that there is not at least a scintilla of evidence to support a finding that the condition, disease, or ailment for which plaintiff was hospitalized did not exist on January 20, 1961, the effective policy date.

It is true that the doctor diagnosed plaintiff's condition as acute and chronic cholecystitis and the operation disclosed a gallstone which, in the doctor's opinion existed twenty-three days prior to her hospital admission. He does not say that she had acute cholecystitis twenty-three days prior to her admission, although he does say that, in his opinion, her gall bladder was not normal.

In an annotation in 81 A.L.R.2d at page 933, in § 6, may be found cases bearing on provisions in hospital service contracts which undertake to exclude coverage for a condition existing at the inception of coverage. Among the cases cited appears that of a woman who had bunions on both feet when the contract was made, although the bunions did not interfere with her activities and did not require hospital treatment. Later, she struck her left bunion against a door and the bunion became worse and required hospital treatment. The Texas court said:

"We hold that the treatment given Mrs. Bass' left foot was covered by the contract of insurance and that it was not excluded from the contract by the provision quoted above. That provision ex-

"Q. Would you say, doctor, based on the medical history that you had and on the examination you made of both the gall stone and gall bladder and the laboratory reports and other reports, would you say that Miss Nelson had a normal gall bladder on January 21, 1961, which I recall was twenty-three days before her admission?
"A. No, in my opinion, she did not have a normal gall bladder."

cluded liability for treatment for 'physical conditions existing' when the contract was made; and the condition of the left foot which was treated did not exist then and was not a consequence of a condition which did exist then. It was the product of a blow which happened afterward. Perhaps the bunion was more susceptible to injury by such a blow than another part of the foot was, but that fact alone was not a defense to the claim for the hospital treatment given Mrs. Bass' left foot." Group Hospital Service v. Bass (Tex.Civ.App.), 252 S.W.2d 507, 509.

See: Abernethy v. Hospital Care Assoc., 254 N.C. 346, 119 S.E.2d 1, where the appellate court held that trial court did not err in finding that defendant had not carried the burden of proving that plaintiff suffered from "gall bladder trouble" prior to the effective date of the policy.

On the other hand, in another gallstone case, the waiting period provision recited:

" 'WAITING PERIOD

" 'Subject to the provisions of [the paragraph dealing with Exclusions], benefits under this Contract will be available for the following *only after the Contract has been in effect for a waiting period of ten consecutive calendar months * *:*

" '(1) Pre-existing conditions: namely, any *condition, disease or ailment which existed on the Effective Date * * *, whether known or not known by the Subscriber; * * *'* " Medical Serv. of District of Columbia v. Llewellyn (Dist. Col.App.), 208 A.2d 734, 735.

In *Llewellyn,* the effective policy date was May 1, 1962. Plaintiff was hospitalized and operated on September 20, 1962. She claimed benefits for expenses of surgical removal of gallstones but the defendant rejected her claim on the ground that the condition for which she was operated on existed prior to the effective date of the policies and came within the exclusion. The trial court ruled that plaintiff's existing physical condition on the contract date

did not disqualify her from recovery under the contract. It was not until September, 1962, that x-rays revealed the presence of stones in her gall bladder. Although an operation was not absolutely necessary at that time, plaintiff underwent a cholecystectomy at which time 77 gallstones were removed. A medical expert for defendant testified that 77 gallstones the size of a pea could not have been formed between May and September of the same year but could only have been formed over a period of many years; that the presence of gallstones would certainly constitute a diseased state; that the presence of 77 gallstones in plaintiff's gall bladder September 20, 1962, necessitated the conclusion that on May 1, 1962, there was disease present. The appellate court reversed and declared that the record established that plaintiff suffered from a condition or ailment which pre-existed the effective date of the policies sued on and was precluded from recovery.

■ In the instant case, the medical testimony lacks the positive and unconflicting character of the testimony in *Llewellyn.* There the testimony was to effect that the gallstones could not have been formed after the effective date and that their presence necessitated the conclusion that they were present on the effective date. In the instant case, the record contains statements of the doctor that: "I couldn't tell how long it took the stone to form, nobody knows"; and: ". . . . it might have formed in two days . . . ."

In this state of the evidence, we hold that the court did not err in refusing defendant's requested affirmative charges.

*Assignment 5.*

Defendant assigns that the court erred in giving plaintiff's requested charge 5 which recites:

"5. I charge you Gentlemen of the jury that where a gall bladder condition first manifested itself after the effective date

of the policy, though it was caused by a condition which could lie dormant for years and cause no symptoms, and which probably had existed before effective date of the policy, such abnormality could not be considered a disease until some manifestation thereof exhibited itself."

Such a charge might possibly be appropriate in a case where the policy excluded coverage ". . . . '. . . . unless such conditions or diseases shall originate after this policy has been in force for six months after date of issue.'" See Jefferson Life and Casualty Co. v. Bevill, 38 Ala.App. 384, 86 So.2d 289, where the Court of Appeals said:

"Clearly under the evidence the appellee's symptomless and benign abnormality could not be considered a disease until some manifestation thereof exhibited itself. * * *" (38 Ala.App. at page 387, 86 So.2d at page 292.)

Certiorari was denied in the same case at 264 Ala. 206, 86 So.2d 292. See also: National Casualty Co. v. Hudson, 32 Ala. App. 69, 21 So.2d 568.

We are of opinion that, in the instant case, where the policy provides that coverage shall not be available for any condition or disease (known or unknown), which existed on the effective date, the issue is not whether the disease had manifested itself on or before the effective date. Under the language of the instant policy, coverage was not available for a condition or disease which existed on the effective date, although the existence of the disease may have been unmanifested and unknown on that date. The charge recites, to the contrary, that a gall bladder condition could not be considered a disease until some manifestation thereof exhibited itself.

We are, therefore, of opinion that charge 5 is an incorrect statement of the law in the case at bar and giving it was reversible error.

*Assignment 4.*

Defendant assigns that the court erred in giving plaintiff's requested charge 4 which recites:

"4. I charge you Gentlemen of the jury that the word 'sickness', in policy providing indemnity for hospital expense caused by sickness, is any morbid condition of body which hinders and prevents organs thereof from normally discharging their several functions for time being or any affection of body which deprives it temporarily of power to fulfill its usual functions."

We have not found the word, sickness, in the instant contract. Charge 4 may be a correct definition of the word, sickness, but it is misleading and should not have been given.

*Assignment 9.*

Defendant assigns for error the refusal of defendant's requested charge D4 which recites:

"D4. I charge you, gentlemen of the jury, that if you are reasonably satisfied from the evidence in this case that the gall bladder disorder for which the plaintiff, Jeanette Nelson, was hospitalized on February 12, 1961, had its orgin (sic) or beginning prior to January 20, 1961, then your verdict should be for the defendant."

This charge employs the words "origin or beginning." We have not found either of these two words in the contract. Therefore, we think this charge abstract, possibly misleading, and, therefore refused without error.

*Assignment 8.*

Defendant assigns for error refusal of defendant's requested charge D3 which recites:

"D3. I charge you, gentlemen of the jury, that if you are reasonably satisfied from the evidence in this case that the

plaintiff, Jeanette Nelson, seeks to recover benefits for hospitalization due to a disease, ailment or condition which existed prior to January 20, 1961, then your verdict should be for the defendant."

We say again that the contract provided that hospital service shall not be available for any condition, etc., which existed on the effective date, January 20, 1961. Charge D3 so recites. Defendant had pleaded that plaintiff's hospitalization was for a condition, etc., which existed on the effective date. Issue was taken on the plea. We think defendant was entitled to have its theory of the case made by the pleadings and issues presented to the jury by proper instructions. State Farm Mutual Auto Ins. Co. v. Dodd, 276 Ala. 410, 162 So. 2d 621; Calvert v. Bynum, 255 Ala. 172, 50 So.2d 731; Western Union Telegraph Co. v. Smith, 189 Ala. 534, 66 So. 578. We have not found where the court stated to the jury, in oral charge or other given charges, defendant's theory which is embodied in charge D3.

It is true that the court did charge that defendant had pleaded the policy provision, "3. PRE-EXISTING CONDITIONS," etc., which we set out above, and the court did read that provision to the jury, and did instruct that if the jury are reasonably satisfied that plea 2 is true, then the jury should not find for the plaintiff. The oral charge did not, however, state to the jury defendant's theory as expressed in charge D3. Charge D3 is an explanatory charge and we think it should have been given.

*Assignment 10.*

■ Defendant assigns for error that the court erred in charging the jury orally as follows:

"Now, gentlemen of the jury, I charge you that where a clause in an insurance policy is susceptible of two constructions it will be construed liberally in insured's favor and strictly against the insurer."

Defendant excepted to the quoted part of the oral charge on the ground that the contract is not shown to be ambiguous.

This court has said:

"We think our cases mean that the court, and not the jury, will analyze and determine the meaning of a contract, whether verbal or written when its terms are clear and certain, and also ascertain whether or not it is ambiguous in the light of its terms, and if it is found to be ambiguous, but not void for uncertainty, its meaning may be clarified by a consideration of the facts and circumstances *aliunde* and *in pais*, and when so it is the province of the jury to ascertain those facts and draw inferences from them which carries to the jury the whole issue upon proper instructions by the court." Air Conditioning Engineers v. Small, 259 Ala. 171, 176, 177, 63 So.2d 698, 703.

In an action on a life policy, an Indiana court held it error to give a charge similar to the part of the oral charge excepted to in the instant case.[4] The instant policy

---

4. The Indiana court said:
"Complaint is made of the following instruction: 'A contract of insurance, like the one in the case at bar, is by the court liberally construed, with a view to effectuate its purpose. The language of the policy and of the interrogatories and provisions of the application are prearranged by the company. In its preparation the insured has no part. Whatever there may be in the language so prepared by the company which has any tendency to defeat the main purpose of the contract; should be strictly construed against

the company. If there is any ambiguity in an interrogatory propounded to the applicant, it should be construed most strongly against the company, and most favorably to the insured, in whose favor all doubts should be resolved.'

"While the above instruction contains a correct statement of a principle of the law governing the construction of contracts of insurance (Penn Mut. Life Ins. Co. v. Wiler, 100 Ind. 92, 50 Am.Rep. 769), yet, as the language indicates, it is a rule for the guidance of courts in the construction of such contracts. It

denies coverage for any condition, disease, or ailment which "existed" on the effective date. The word "originated" is not employed.

Plaintiff has not pointed out wherein the contract sued on is ambiguous and has not responded to defendant's argument in support of Assignment 10. We are not advised of any respect wherein the provision of the policy quoted and relied on in plea 2 is ambiguous. We are, therefore, of opinion that defendant's exception to the oral charge was well taken and that, in giving the part of the oral charge excepted to, the court erred to reversal.

### Assignment 2.

In view of another trial, we pretermit deciding whether the verdict is contrary to the great preponderance of the evidence.

For errors asserted in Assignments 5 and 10 the judgment is reversed and the cause remanded.

Reversed and remanded.

LIVINGSTON, C. J., and LAWSON and GOODWYN, JJ., concur.

has been so long and often held that it is the duty of the court, and not the jury, to construe a contract that is plain and unambiguous, that the citation of authorities is unnecessary. The first sentence in the instruction states a matter of no concern to the jury, and, if it had any effect, the jury doubtless inferred that they should give the contract a liberal construction. It may be the fact, also, that the language of the policy and the provisions of the application were prearranged by the company, and that in the preparation of the policy the insured had no part, but there was no evidence to that effect. Had these been material facts in appellee's case, an instruction could not assume their truth, where they were not only not proven, but about which no testimony was offered. But in the concluding part of the instruction, that, 'if there is any ambiguity in an interroga-

tory propounded to the applicant, it should be construed most strongly against the company, and most favorably to the insured, in whose favor all doubts should be resolved,' it is left to the jury to determine whether there is any ambiguity in the interrogatories asked the applicant; and, if there is, they are told how they should then construe it. We fail to see how the jury could otherwise understand the instruction, than that they were to construe the contract, and that this construction should be made according to certain rules. It is not claimed that the contract is ambiguous. No attempt was made to explain any supposed ambiguity. As the contract was plain and unequivocal, it was error to leave its construction to the jury. (Citations Omitted.)" Union Life Ins. Co. v. Jameson, 31 Ind. App. 28, 31, 32, 33, 67 N.E. 199, 200.